**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190455-U

Order filed January 10, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0455 Circuit No. 17-CF-727 |
| | ) | |
| ANDREW E. JACKSON, | ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices McDade and Schmidt concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State proved defendant guilty beyond a reasonable doubt of armed robbery. (2) The court's definition of a firearm did not deprive defendant of his right to a fair trial. (3) The State's comments during its closing argument were not reversible plain error. (4) The State did not commit reversible plain error when it improperly impeached a defense witness with extrinsic evidence.

¶ 2    Defendant, Andrew E. Jackson, argues that (1) the State failed to prove him guilty beyond a reasonable doubt of armed robbery; (2) the Peoria County circuit court denied defendant a fair trial where it failed to provide a complete definition of a firearm; (3) the State committed

prosecutorial misconduct during its closing argument; and (4) the State erroneously used extrinsic evidence to impeach John Born's testimony on a collateral matter. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with armed robbery (720 ILCS 5/18-2(a)(2), (b) (West 2016)), and aggravated robbery (*id.* § 18-1(b)(1), (c)). Defendant waived his right to counsel and proceeded as a self-represented litigant during the pretrial proceedings and jury trial.

¶ 5        Adukeama Ball, a cashier at Dollar General, testified that on August 26, 2017, at approximately 2:45 p.m. defendant asked Ball to open the register several times. While making the demands, defendant's hand was on the left side of his waistband, holding the handle of a black firearm. Ball feared that defendant would use the firearm to shoot her. Ball informed defendant that he would need to purchase an item to open the register. Defendant handed Ball an item that she scanned. When the register opened, defendant reached over the counter and removed money. Ball testified that she had seen photographs of firearms and confirmed that the object defendant held at his waist was the handle of a firearm.

¶ 6        The State entered a surveillance video into evidence that showed Ball behind the counter at a register while defendant stood on the other side of the counter. Defendant held the left side of his waistband with his left hand. Defendant reached over the counter and removed money from the register.

¶ 7        On cross-examination, defendant asked Ball if the firearm she observed had a hammer. Ball indicated that she did know "what a hammer is." Ball observed "the handle of a black gun that [defendant] continuously held in [his] waistband." Defendant then asked, "You're 100 percent sure you seen [*sic*] a firearm, but you're not sure what the hammer of a firearm is?" Ball responded, "I'm a hundred percent sure I [saw] a fire—a handle of a gun." Ball said the object could not have

2

been a cell phone because she observed a "black gun handle." Defendant asked what markings indicated that it was a firearm. Ball responded, "[t]he handle itself. The handle of a gun is distinctive. How a person holds the handle of a gun is just—it was a gun." When questioned on her familiarity with firearms, Ball stated, "I'm familiar enough to know if I [saw] one, I know a gun is a gun." Ball admitted that before the robbery she had never owned a firearm or held a firearm. The following colloquy occurred between defendant and Ball regarding whether the object defendant carried was a working firearm:

"Q. Did the gun shoot—was it a firearm, as in one that shot bullets? Can you tell me that?

A. It was a gun. How would I know if it was working? It was a gun.

Q. So it could have been a bb gun?

A. You had a gun.

* * *

Q. Could it have been a bb gun?

* * *

[A.] I can't answer that question."

¶ 8 Mykisha Randall testified that she witnessed the robbery in Dollar General. When Randall approached the register to pay for her items, she saw defendant reaching over the counter into the register. Randall saw a black firearm that she subsequently identified as a pistol on the left side of defendant's waistband. Defendant removed the money from the register and left the store. Randall did not own firearms but had seen firearms before. Randall saw the "butt" of the firearm hanging out of defendant's waistband. Randall said there was "[z]ero" chance that the object was a cell phone.

3

¶ 9         On cross-examination, Randall acknowledged that a woman stood between her and defendant, but the woman did not obstruct Randall's view. Randall was "positive[ ]" that she saw defendant gripping the black handle of a pistol. Randall said the object could not have been a cell phone, "[u]nless it was like a toy cell phone/gun combo, it wasn't a cell phone."

¶ 10        Peoria Police Officer Ryan Isonhart reported to the Dollar General on August 26, 2017, at approximately 4:45 p.m. to investigate an armed robbery. Isonhart spoke to Ball and Randall and received a description of the suspect. On cross-examination, defendant asked how Ball described the firearm. Isonhart explained that when he interviews civilians he asks if the observed firearm was a "cowboy-style gun" or similar to Isonhart's black semiautomatic handgun. Ball likened defendant's firearm to Isonhart's handgun. Isonhart's firearm was in a holster where only the handle was visible.

¶ 11        Peoria Police Sergeant David Smith testified that while investigating the robbery, he observed the surveillance video from Dollar General of the incident. Smith identified defendant in the video as the individual removing money from the register.

¶ 12        Defendant called John Born, his uncle and former landlord, to testify. A few days after August 26, 2017, John moved defendant's items out of the house that defendant rented. John did not locate a firearm in defendant's items. John did not know if defendant owned or possessed a firearm. John said defendant kept his cell phone in a waistband clip.

¶ 13        On cross-examination, John denied that defendant was three months behind on rent but said that defendant was approximately one month behind on rent. John communicated to defendant's mother that John wanted defendant to vacate his rental property. John identified a photograph of defendant, which showed that defendant had an object in his shirt pocket that could have been a cell phone.

¶ 14    Diana Born, defendant's aunt, testified that defendant always wore his cell phone in a belt clip. Diana identified defendant in a photograph that showed defendant carrying a cell phone in his shirt pocket. Diana did not know why defendant carried his cell phone in his shirt pocket or if defendant had a belt clip for his phone on that day.

¶ 15    Defendant testified that on August 26, 2017, he entered Dollar General to purchase something to eat when he decided to steal money from the register. Defendant thought, "[i]f I just ask for the money, I'll be able to go get high and go to rehab and get some help. *** I didn't think nothing of grabbing my phone during the incident." Defendant denied that the object he held during the robbery was a firearm. Defendant believed that he did not need a firearm to rob the store.

¶ 16    On cross-examination, defendant testified that he robbed the store as a cry for help because defendant knew he needed drug rehabilitation treatment. Defendant planned to "go get high for free, and then go to rehab." Defendant turned himself in to police five days after the robbery. At the time of the robbery, defendant was one month behind on rent.

¶ 17    In rebuttal, the State called Smith, who testified that when he interviewed John, John stated that defendant was three months behind on rent.

¶ 18    The State entered into evidence a certified copy of defendant's prior conviction for attempted home invasion.

¶ 19    During its closing argument, the State argued defendant's version of events was incredible. The State contended that defendant wanted the jury to think

        "[defendant] did [the robbery] on purpose, *** it was a cry for help because he's got a drug problem and this might set him on the right path. That, first of all, [defendant] is trying to get you to believe the Hollywood version of what a drug

5

addict is. A person with a drug problem is not a person who automatically thinks to victimize a person while they're working at a register.

I think other people with a drug problem who heard that would be mightily offended to be compared to *** that suggestion, that that's how the average person with a drug difficulty was. If he had a working phone in his pocket and knew he needed help, he could have called somebody. He could have not gone in the store. He could not have robbed the place."

The State continued,

"This was no small, little cry for help, because he could have cried for help any other number of ways.

And if it were a cry for help, his behavior would have been consistent with someone doing that just to get arrested. I suppose that does happen, people who get arrested on purpose. But then they're there when the police show up."

¶ 20    The State also commented on defendant's cross-examination of the State's witnesses. The State said, "I was a little confused when the defendant tried to ridicule [Randall's] description of [the suspect]." The State characterized defendant's cross-examination of Smith as "very disingenuous[ ]." Regarding defendant's questioning of Ball, the State said,

"I know [defendant] testified he was sorry, but he didn't seem too sorry when he was questioning [Ball] and giving her a hard time about what she saw. But his whole attitude in questioning her was that this—and even his testimony is that this is so obviously a phone sticking out. *** [Ball] would not be that upset if it was so obviously a phone sticking out."

¶ 21    The State argued that defendant's witnesses were incredible.

"[Defendant's] defense apparently is that ***, 'Don't worry everybody. That's just a phone in my waistband.' By the way, that he's only holding when he goes up to the register, holding it the whole time he leans over the register and starts digging the money out of the register. That's his defense. So again, apply what you know about the world and the people you met and how it turns, and ask yourself this: Does that make any sense to you at all?

And first of all, please notice the inconsistencies in that whole fiction he's spinning you. He always carries his phone in his waistband, was his defense. *** [John] kind of goes along with the story. 'Sure, it's always in his waistband.'

And then what do you see? A picture of him at a party some weeks before with a phone in his shirt pocket, and somewhat go against his routine habit of always carrying in his waistband. But does that make any sense at all? Why not his pocket? Back pocket, front pocket, whatever. Why his waistband?

***

He then called his aunt and modified it a bit ***.

The aunt had no idea what he was talking about. *** What an awful position he put his aunt and uncle in. I mean, they should have known better than to do it. But clearly, when his aunt was sitting here and he starts asking about side clips and the phone, she had no idea what [defendant] was talking about. It's because it wasn't part of the script. [Defendant] changed it up on her. It's hard to keep a story straight when the story's fiction and it's involving three different people.

\* \* \*

[Defendant] had a lot of options to him. Apparently, he's got, at the very least, an aunt and uncle who will do anything for him, including coming to court with a nonsensical story."

¶ 22    The State argued that Ball was not required to know the components of a firearm to be able to identify a firearm. The State said,

"The defendant tried to ask [Ball], 'Well, do you even know what a hammer of a gun is?' [Ball] didn't know, probably because she doesn't know as much about guns as the defendant does. But everybody, I submit to you, knows what a gun looks like. They're not—sadly, they're not all that uncommon. Even from the movies or TV shows, everyone knows what the handle of a gun looks like. And she was right up on it and saw it."

The State further argued that Ball and Randall were

"[t]wo people that don't even know each other and could describe [the firearm]. They could describe it to the extent that when the first officer showed up, he said he always has to ask people, 'Was it a cowboy gun,' like *** if you're familiar with a revolver, 'or a gun like the police had?' And he had a gun and they pointed to his gun and were like, 'No. It's like the one the police have.' "

¶ 23    Later, the State addressed the inconsistent testimony regarding defendant's delinquent rent payments, and stated,

"I appreciate his uncle says that he was behind for a month, and I proved he had said before it was three months. *** [T]he uncle had told this defendant's mother that [defendant] needed to be out. He's way behind. He's getting out of his house. The guy needed money."

8

¶ 24 Following closing arguments, the court provided the following instructions to the jury: (1) "[t]he word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas"; (2) counsel's arguments were not evidence and "any statement or argument by the attorney or the defendant which is not based on the evidence should be disregarded"; and (3) the jurors were the "judges of the believability of the witnesses and of the weight to be given to the testimony of each of them."

¶ 25 The jury found defendant guilty of armed robbery and aggravated robbery. Defendant filed a motion for a new trial. The court denied defendant's motion. The court sentenced defendant to 22 years' imprisonment. Defendant appeals.

¶ 26                                    II. ANALYSIS

¶ 27                           A. Sufficiency of the Evidence

¶ 28 Defendant argues the State failed to prove him guilty beyond a reasonable doubt of armed robbery because it failed to establish that defendant had a firearm during the robbery.

¶ 29 When a defendant makes a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 30    To prove defendant guilty of armed robbery, the State needed to establish that defendant knowingly took property by the use or threat of force while armed with a firearm. 720 ILCS 5/18-1, 18-2(a)(2) (West 2016). For purposes of armed robbery, "Firearm" is defined under the Firearm Owners Identification Card Act (FOID Act) as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2016); *People v. Wright*, 2017 IL 119561, ¶ 71. Pneumatic, spring, paint ball, "B-B" and signaling guns are excluded from the definition of a firearm. 430 ILCS 65/1.1 (West 2016). The testimony of a single witness is sufficient to establish that an object is a firearm. *Wright*, 2017 IL 119561, ¶ 76. "The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *People v. Swenson*, 2020 IL 124688, ¶ 36. When presented with unequivocal testimony and circumstances that a witness viewed a firearm, a jury may reasonably infer that defendant possessed a firearm as defined under the FOID Act. See *People v. Washington*, 2012 IL 107993, ¶ 36.

¶ 31    Defendant does not contest that he robbed Dollar General but argues that the State failed to show that he carried a firearm while committing the robbery. Specifically, the witnesses who testified that defendant held a firearm had no experience handling firearms.

¶ 32    Here, Ball and Randall repeatedly identified the object that defendant held in his waistband during the robbery as the handle of a black firearm. Ball saw the handle of a black firearm when defendant asked her to open the register. Ball said that she was "a hundred percent sure" that she saw defendant holding the handle of a black firearm. Ball further identified defendant's firearm as similar to Isonhart's handgun. Randall's testimony confirmed Ball's observation, as Randall also saw defendant holding what she believed to be the handle of a black firearm. Both Randall and

10

Ball testified that they had previously observed firearms and expressed that the object in defendant's waistband was not a cell phone. Viewed in the light most favorable to the State, the testimony of Ball and Randall proved beyond a reasonable doubt that the object in defendant's waistband was a firearm.

¶ 33                                    B. Plain Error

¶ 34        Defendant forfeited review of the following three arguments by failing to properly preserve them below. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must object to it at trial and raise it in a posttrial motion). However, defendant argues that each of these errors is reversible under the plain error doctrine.

¶ 35        The plain error doctrine allows a reviewing court to consider an otherwise forfeited error when " '(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence.' " *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005). Under the first prong, to determine whether the evidence is close, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This analysis considers the elements of the charged offenses, along with any evidence regarding witness credibility. *Id.* The determination is not one of the sufficiency of the evidence, but "the closeness of sufficient evidence." *Id.* ¶ 60. Under the second prong, "[p]rejudice to the defendant is presumed because of the importance of the right involved." *Herron*, 215 Ill. 2d at 187. The supreme court has equated the second prong of plain error review with structural error such that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting

11

*Herron*, 215 Ill. 2d at 186). The defendant bears the burden of persuasion under both prongs. *Herron*, 215 Ill. 2d at 187. The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 36                                1. Jury Instruction Error

¶ 37        Defendant contends that the circuit court erroneously gave the jury an incomplete definition of a firearm.

¶ 38        The determination of which instruction shall be given to a jury lies within the circuit court's discretion and will not be overturned absent an abuse of that discretion. *People v. Banks*, 287 Ill. App. 3d 273, 279 (1997). Whether the jury instructions accurately conveyed the applicable law to the jury is reviewed *de novo*. *People v. Fonder*, 2013 IL App (3d) 120178, ¶ 19.

¶ 39        Assuming for the sake of argument that the court's failure to instruct the jury using the complete FOID Act definition of a firearm was error, that error was not a reversible plain error. First, the evidence of defendant's commission of armed robbery was not close. Ball testified that she was certain the object that defendant held while robbing the Dollar General was a firearm like Isonhart's handgun. Randall similarly testified that the object that defendant carried was a pistol. Randall indicated that the pistol could not have been a cell phone, stating, "[u]nless it was like a toy cell phone/gun combo, it wasn't a cell phone." Moreover, defendant's testimony that the object was a cell phone did not outweigh Ball and Randall's consistent and conclusive testimony that identified the item as a firearm. Therefore, the evidence was not closely balanced, and the omitted instruction was not a reversible error under the first prong of plain error.

¶ 40        Second, the instruction error does not warrant reversal under the second prong of the plain error analysis because the error was not so serious that it affected the fairness of defendant's trial

and challenged the integrity of the judicial process. Therefore, the circuit court did not commit plain error by giving an incomplete instruction regarding the definition of a firearm.

¶ 41                                    2. Prosecutorial Misconduct

¶ 42      Defendant contends the following acts of prosecutorial misconduct in the State's closing argument deprived him of a fair trial, the State: (a) misstated the evidence and the law; (b) accused defendant of inducing perjury; (c) disparaged defendant for exercising his right to cross-examine witnesses; and (d) improperly bolstered the credibility of its witnesses.

¶ 43      "Closing arguments must be viewed in their entirety and the allegedly erroneous argument must be viewed contextually." *People v. Blue*, 189 Ill. 2d 99, 128 (2000). "Generally, improper closing arguments by the State will constitute reversible error only if there is doubt as to whether the jury would have rendered a guilty verdict in the absence of the comments." *People v. Libberton*, 346 Ill. App. 3d 912, 924 (2003).

¶ 44                                 a. Misstating the Evidence and Law

¶ 45      Defendant argues the State misstated evidence where it asserted defendant wanted the jury to "believe the Hollywood version of what a drug addict is" and that if the robbery "were a cry for help, his behavior would have been consistent with someone doing that just to get arrested."

¶ 46      Here, defendant testified that he robbed Dollar General so that he could "get high and go to rehab and get some help." The State's comments were made in response to this testimony and sought to have the jury consider the credibility of defendant's testimony. Therefore, viewing the argument in context, the statements were not improper. See, *e.g.*, *Glasper*, 234 Ill. 2d at 204, 208 (finding the State's closing argument comment was not error because they were invited by defense counsel's comments).

¶ 47                              b. Accused Defendant of Inducing Perjury

13

¶ 48    Defendant argues that the State improperly suggested that defendant induced two witnesses, John and Diana, to perjure themselves on defendant's behalf. Generally, a closing argument that suggests that the defense suborned perjury is improper. *People v. Emerson*, 97 Ill. 2d 487, 497 (1983).

¶ 49    Even if we were to assume that the State erred by suggesting defendant induced witnesses to lie, the error would not rise to the level of reversible plain error. First, we previously determined that the evidence was not closely balanced. *Supra* ¶ 39. Second, this error is not reversible under the second prong because it is not so prejudicial that it eroded the integrity of the judicial process. Moreover, any prejudice that flowed from this error was greatly reduced by the court's jury instruction that arguments were not evidence and that "any statement or argument made by the attorney or the defendant which is not based on the evidence should be disregarded." See *People v. Ramsey*, 239 Ill. 2d 342, 438 (2010) (the act of properly sustaining an objection to an improper comment and instructing the jury to disregard it is usually sufficient to eliminate any prejudice). Although defendant did not object to the improper comment, the court's instruction greatly reduced the amount of prejudice flowing from it such that the improper comment did not erode the integrity of the proceeding.

¶ 50                    c. Defendant's Right to Cross-Examine Witnesses

¶ 51    Defendant argues "[i]t was reversible error for the prosecutor to use [defendant's] decision to exercise his right to cross-examine witnesses against him." Specifically, defendant points to the State's comments regarding defendant's cross-examination of Ball, Randall, and Smith.

¶ 52    The sixth amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. The Supreme Court described this requirement as "confrontation

14

plus cross-examination of witnesses." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Generally, "[n]egative comments about a defendant's exercise of his or her constitutional rights are improper because they penalize the defendant for the exercise of those rights." *Libberton*, 346 Ill. App. 3d at 923.

¶ 53    Here, viewed in the context of the entire closing argument, the State did not criticize defendant's right to cross-examine witnesses. Instead, the State commented on the manner that defendant cross-examined the witnesses. *Cf. id.* (finding error where the State's argument suggested that a decent person in defendant's position would have waived his right to a trial and pled guilty). Therefore, the State's comment on defendant's method of cross-examination was not error.

¶ 54                              d. Bolstering the Credibility of its Witnesses

¶ 55    Defendant argues that the State misstated the evidence and improperly bolstered the credibility of its witnesses. First, the State informed the jury that it had proved defendant carried a firearm because "everybody *** knows what a gun looks like." Second, the State misstated the facts to suggest that the witnesses observed Isonhart's firearm immediately following the robbery. Third, the State suggested that both witnesses observed Isonhart's firearm.

¶ 56    Here, we will assume for the sake of argument that the State's comments in closing argument were error. However, this error was not a reversible plain error as the evidence was not closely balanced. *Supra* ¶ 39. Further, the error was not of such magnitude that it eroded the integrity of the judicial process and infringed on defendant's right to a fair trial. Any prejudice caused by the error was limited by the court's instruction to the jury that arguments were not evidence, that "any statement or argument made by the attorney or the defendant which is not based on the evidence should be disregarded," and that the jurors "are the judges of the

15

believability of the witnesses." See *Ramsey*, 239 Ill. 2d at 438. Accordingly, this misstatement of evidence is not a reversible plain error.

¶ 57                                3. Improper Impeachment

¶ 58     Defendant contends that the State improperly impeached John with extrinsic evidence of the number of defendant's delinquent rent payments.

¶ 59     "Generally, any permissible kind of impeaching matter may be developed on cross-examination ***." *Collins*, 106 Ill. 2d at 269. However, extrinsic evidence may not be introduced to impeach a witness's testimony about a collateral issue, and the examiner must accept the witness's answer. *People v. Terrell*, 185 Ill. 2d 467, 509 (1998). An issue is considered collateral if the subject matter is not relevant for any purpose other than to contradict the testimony of the witness. *People v. Santos*, 211 Ill. 2d 395, 405 (2004). A matter is not collateral if the subject matter is relevant in the litigation to establish a fact of consequence. *People v. Hayes*, 353 Ill. App. 3d 578, 583 (2004). The court has the discretion to determine the latitude on cross-examination, rebuttal, and when determining whether an issue is collateral. *Collins*, 106 Ill. 2d at 269-70. A reviewing court should not interfere unless there is a clear abuse of discretion. *Id.*

¶ 60     In the present case, the issue of whether defendant was behind one or three months of rent was not a fact of consequence regarding the armed robbery and was an improper collateral issue. However, defendant failed to establish plain error where the evidence was not closely balanced, and the error did not erode the integrity of the judicial process and deprive defendant of a fair trial. *Supra* ¶ 39.

¶ 61                                III. CONCLUSION

¶ 62     The judgment of the circuit court of Peoria County is affirmed.

¶ 63     Affirmed.